UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICETTE BALUKJIAN, *et al.*,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>VIRGIN AMERICA, INC., *et al.*,<br><br>　　　Defendants. | Case No. 18-cv-00185-SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST CAUSE OF ACTION AND GRANTING IN PART MOTION TO DISMISS SIXTH CAUSE OF ACTION**<br><br>Re: Dkt. No. 15 |

Defendants' motion to dismiss the first and sixth causes of action is scheduled for a hearing on March 16, 2018. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument and VACATES the hearing. For the reasons set forth below, the Court GRANTS defendants' motion to dismiss the first cause of action without leave to amend, and GRANTS IN PART defendants' motion to dismiss the sixth cause of action.

**BACKGROUND**

On January 9, 2018, plaintiffs filed this lawsuit against Virgin America, Inc., Alaska Airlines, Inc., and Does 1-20. Plaintiffs are Nicette Balukjian, individually and as successor in interest to the Estate of Romulo C. Valdez; Romelyn Woodruff; Romulo "Romy" Valdez, Jr.; and Dwight "Ike" Valdez. Balukjian, Woodruff, Valdez, Jr., and Valdez are the surviving children of

Romulo C. Valdez ("Valdez" or the "decedent"). Compl. ¶ 5.

The complaint alleges that on July 4, 2017, Balukjian and her father, Valdez, took a red-eye flight from San Francisco to Boston on a plane operated by defendants. *Id*. ¶¶ 11-12. Balukjian and Valdez were traveling with a "portable oxygen concentrator" for her father's use, and Balukjian stored the concentrator in the overhead bin. *Id*. ¶ 14.

Approximately three hours into the flight, Valdez woke Balukjian and said, "oxygen." *Id*. ¶ 15. Balukjian retrieved the portable oxygen concentrator from above their seats and set the oxygen tank near her father. *Id*. ¶ 16. At that point, a flight attendant came over and asked what was wrong. *Id*. ¶ 17. Balukjian told the flight attendant that her father was having difficulty breathing and needed oxygen, and Balukjian continued attempts to set up the portable oxygen concentrator. *Id*. The cabin lights were off because it was the middle of the night on a red-eye flight, and Balukjian was having difficulty connecting the tubes to the oxygen tank given the minimal light levels. *Id*. ¶ 18. Balukjian "asked the flight attendant to at least turn on the lights above their seats while she continued to activate the portable oxygen concentrator. The flight attendant complied but did not offer any other assistance." *Id*. ¶ 19.

Balukjian was able to activate the portable oxygen concentrator and put the cannula over her father's head, but was having difficulty keeping the nosepiece in place. *Id.* ¶ 20. Balukjian held the nosepiece in place with her hand, and at some point she asked the flight attendant whether the flight attendant knew how to get the nosepiece to stay in place. *Id*. Balukjian also informed the flight attendant that her father had a pacemaker and other medical issues. *Id.* The complaint alleges that there was no response from the flight attendant. *Id*. A second flight attendant came over to observe the situation. *Id*. ¶ 21. Valdez was still breathing. *Id.*

The complaint alleges, "[f]rom the time of Decedent's initial request for oxygen until the second flight attendant came over, approximately 10-15 minutes had passed. The cabin lights were still off and there had been no announcement requesting that any medical care professionals identify themselves. The flight attendants did not offer any assistance and did not seem to comprehend the urgency of the situation; namely, there was a man struggling to breathe on the plane." *Id*. ¶ 22.

2

For the following 10-15 minutes, Balukjian continued to hold the nosepiece in place and Valdez was still breathing. *Id.* ¶ 23. Suddenly, Valdez stopped breathing, and the screen on the portable oxygen concentrator read "Check Cannula, No Breathing Detected." *Id.* ¶ 24. In a panicked state, Balukjian informed the flight attendants what the screen said. *Id.* ¶ 25. One of the flight attendants brought over the airline's oxygen tank and told Balukjian to place the apparatus over Valdez's head and mouth. *Id.* The flight attendants then made an announcement requesting that any medical care professionals identify themselves. *Id.*

A few more minutes passed and Valdez still had not resumed breathing. *Id.* ¶ 26. The flight attendants then made a second announcement requesting that any medical care professionals identify themselves for a "medical emergency." *Id.* A young man, who was a first-year medical student, responded to the announcement. *Id.* ¶ 27. The medical student and a flight attendant lifted Valdez from his seat and carried/dragged him to the front of the plane in order to perform CPR on Valdez. *Id.* ¶ 28. "As they were half dragging Decedent through the aisle, his arms became stuck in the doorway and Ms. Balukjian had to tell them to stop momentarily while she adjusted Decedent's arms." *Id.*

The medical student and the flight attendant placed Valdez on the floor in the front of the plane and the medical student began to perform chest compressions. *Id.* ¶ 29. Nobody performed mouth-to-mouth resuscitation on Valdez. *Id.* From the time Valdez first requested oxygen to the time chest compressions began, approximately 20-30 minutes had passed. *Id.* ¶ 30. The medical student "diligently" conducted chest compressions and did so "for a very long time[,] and at some point told the flight attendants that they would need to help, and they would rotate performing the compressions." *Id.* ¶ 31. The flight attendants complied and began performing chest compressions." *Id.*

Occasionally, a telephone inside the cabin would ring and a flight attendant would answer it. *Id.* ¶ 32. Balukjian assumed that plans were being made for the flight to divert and land. *Id.* At one point, while the flight attendants were waiting to perform chest compressions, "they began chatting nonchalantly about their social plans in Boston." *Id.* ¶ 33. In addition, one flight attendant "seemed very unconcerned about the situation and did not appear to be putting in the

3

same amount of effort on her chest compressions." *Id.*

Eventually, an automated external defibrillator was brought into the area, and an "unknown number of electric shocks" were applied to Valdez. *Id.* ¶ 34. However, none of the life saving measures the medical student undertook was effective. *Id.* Balukjian estimates that CPR was performed on her father for 90 minutes. *Id.* ¶ 37.

Eventually, the flight attendants informed Balukjian that the flight would be landing in Boston in 30 minutes, and that she would have to take her seat. All further CPR efforts ceased, and it appeared that Valdez had passed away. The flight attendants moved Valdez into a first class seat, and Balukjian was allowed to sit next to him for the remainder of the flight. The flight attendants placed a blanket over Valdez, and a pillow behind his head. *Id.* ¶¶ 35-38. After the plane landed in Boston, Balukjian was instructed to remain seated and let the other passengers deplane. *Id*. ¶ 38. The pilot never came out to offer condolences to Balukjian, and eventually Balukjian was allowed to deplane. *Id*. ¶¶ 38-39.

The complaint alleges the following causes of action: (1) a violation of California's Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welf. & Inst. Code § 15657; (2) negligence; (3) negligent infliction of emotional distress; (4) wrongful death; (5) a survival action; and (6) unlawful business practices against a senior citizen, pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.* and Cal. Bus. & Prof. Code § 17500 *et seq.* Defendants have moved to dismiss the first and sixth causes of action for failure to state a claim.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

4

elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings, without thereby transforming the motion into a motion for summary judgment. *Id*. at 688–89. If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I. First Cause of Action: California's Elder Abuse and Dependent Adult Civil Protection Act

The first cause of action alleges a claim for neglect under California's Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act"), Cal. Welf. & Inst. Code §§ 15600 *et seq.* The complaint alleges that the decedent was over the age of 65 and that at the time of his death, had a physical or mental limitation that restricted his ability to carry out normal activities and/or to protect his rights. Compl. ¶¶ 43, 45. The complaint also alleges that "[w]hile Decedent was in Defendants' custody and care, Defendants were actually aware that Decedent urgently

required medical care and care related to his basic needs. Defendants knew that failure to provide these services to Decedent would pose a high probability of serious physical injury to Decedent. Despite such knowledge, Defendants knowingly and recklessly failed to provide basic needs to and for Decedent." *Id.* ¶ 47. The complaint alleges that defendants' acts and omissions constitute neglect within the meaning of the Elder Abuse Act, Cal. Welf. & Inst. Code §§ 15600 *et seq.*, § 15610.57. *Id.* ¶ 50.[1] Defendants move to dismiss this claim on the ground that the complaint does not allege facts showing that defendants had a caretaking or custodial relationship with the decedent, as is required in order to bring a claim for neglect under the Act.

The Elder Abuse Act provides heightened remedies to elders or dependent adults who can prove "by clear and convincing evidence that a defendant is liable for physical abuse as defined in [Cal. Welf. & Inst. Code] Section 15610.63, or neglect as defined in Section 15610.57," and who can demonstrate that the defendant acted with "recklessness, oppression, fraud, or malice in the commission of [this] abuse." Cal. Welf. & Inst. Code § 15657.[2] Section 15610.57 defines "neglect" as "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." Cal. Welf. & Inst. Code § 15610.57(a)(1).

Defendants contend that plaintiffs have failed to state a claim because the complaint does not allege facts to establish a caretaking or custodial relationship between defendants and Valdez. Defendants rely on *Winn v. Pioneer Medical Group, Inc.*, 63 Cal.4th 148 (2016), in which the California Supreme Court held that "a claim of neglect under the Elder Abuse Act requires a caretaking or custodial relationship — where a person has assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied

---

[1] Plaintiffs' opposition states that plaintiffs bring a claim for "neglect" under section 15610.57 of the Elder Abuse Act. Dkt. No. 17 at 5-6. Despite references to "abuse" in the complaint, plaintiffs do not appear to be pursuing a claim for physical abuse under section 15610.63 of the Act. The Act defines "physical abuse" as assault, battery, unreasonable physical constraint, use of a physical or chemical restraint or psychotropic medication under certain conditions, among other definitions. Cal. Welf. & Inst. Code § 15610.63.

[2] A civil action may also be brought under the Elder Abuse Act for "financial abuse," which is not at issue here. *See generally Mahan v. Charles W. Chan Ins. Agency, Inc.*, 14 Cal. App. 5th 841 (2017) (discussing "financial abuse" under the Act).

and fully competent adult would ordinarily be capable of managing without assistance." *Id*. at 155. The court held that "the focus of the statutory language is on the nature and substance of the relationship between an individual and an elder or a dependent adult. This focus supports the conclusion that the distinctive relationship contemplated by the Act entails more than casual or limited interactions." *Id.* at 158; *see also id*. at 161 ("the phrase 'care or custody' evokes a bond that contrasts with a casual or temporally limited affiliation"). The court noted,

> What the text of section 15610.57 conveys about the Legislature's purpose here—along with related provisions, and similar language in other statutes—supports tethering the concept of neglect to caretaking or custodial situations. But the legislative history of the Act likewise suggests that the Legislature was principally concerned with particular caretaking and custodial relationships, and the abuse and neglect that can occur in that context. First, the legislative declarations accompanying the Elder Abuse Act tend to reinforce a reading of section 15610.57 that imposes a caretaking or custodial prerequisite. The Legislature recognized "that most elders . . . who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and other poor health that place them in a dependent and vulnerable position." (§ 15600, subd. (d), italics added.) The Legislature took note of the "factors which contribute to abuse, neglect, or abandonment of elders and dependent adults [such as] economic instability of the family, resentment of caretaker responsibilities, stress on the caretaker, and abuse by the caretaker of drugs or alcohol." (*Id*., subd. (e).) As these declarations make clear, the Legislature expressed concern for those who are vulnerable and dependent on others for their most basic needs. And the Legislature recognized certain factors that might arise in a custodial setting—emphasizing abuse and neglect by caretakers—in highlighting its rationale for the Act's passage.
>
> Second, the legislative history tends to support the view that the Legislature enacted section 15657 in large part to combat pervasive abuse and neglect in certain health care facilities. (*Delaney*, supra, 20 Cal.4th at pp. 35–36, 82 Cal.Rptr.2d 610, 971 P.2d 986.) As we concluded in *Delaney,* "one of the major objectives of this legislation was the protection of residents of nursing homes and other health care facilities." (*Id*. at pp. 36–37, 82 Cal.Rptr.2d 610, 971 P.2d 986.) That recognition led us to hold as "contrary" to the Legislature's objective the exemption of nursing homes and other similar facilities from section 15657's reach. (Delaney, at p. 37, 82 Cal.Rptr.2d 610, 971 P.2d 986.)
>
> Third, nothing in the legislative history suggests that the Legislature intended the Act to apply whenever a doctor treats any elderly patient. Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme. . . .

*Id*. at 162-63. The court concluded that the plaintiffs in *Winn* had failed to state a claim under the Elder Abuse Act because "[b]eyond the assertion that defendants treated Mrs. Cox at outpatient 'clinics' operated by defendants, plaintiffs offer no other explanation for why defendants' intermittent, outpatient medical treatment forged a caretaking or custodial relationship between

7

Mrs. Cox and defendants." *Id*. at 165.

Defendants also cite this Court's decision in *Gutierrez v. Santa Rosa Memorial Hospital*, No. 16-cv-02645-SI, 2016 WL 7212302 (N.D. Cal. Dec. 13, 2016). In *Gutierrez*, the family of a diabetic woman sued a hospital alleging that the hospital had violated the Elder Abuse Act by ignoring test results that showed the presence of a life-threatening disease and improperly discharging the patient from the emergency room. The plaintiffs had alleged that the patient "was under Defendants' care and custody and in need of acute and ongoing emergency and custodial and long-term medical care." *Id.* at *5. This Court dismissed the plaintiffs' claim under the Elder Abuse Act, finding that "the fact that Gutierrez may have required such care when she presented at the emergency room is not, on its own, sufficient to allege a caretaking or custodial relationship between defendants and Gutierrez." *Id.* (citing *Winn*, 63 Cal.4th at 155). The Court noted that the "plaintiffs allege that defendants failed to provide necessary medical care at a hospital emergency room, not at a residential care facility or skilled nursing facility. Plaintiffs have not cited any authority for the proposition that a caretaking or custodial relationship is present simply because a very sick individual goes to the emergency room to seek care." *Id.*

Plaintiffs argue that they have alleged a caretaking or custodial relationship because "Decedent was at the mercy of Defendants for basic necessities such as food, water, access to a restroom, and access to emergency medical care." Dkt. No. 17 at 7. Plaintiffs assert that neither decedent nor Ms. Balukjian had the ability or authority to force the landing of the plane in order to obtain emergency medical assistance, and they distinguish *Gutierrez* on the ground that it is a medical malpractice case. *Id*. at 6. Plaintiffs do not cite any authority for the proposition that a caretaking or custodial relationship is present under the temporally limited circumstances described in the complaint. To the contrary, the Elder Abuse Act cases cited by plaintiffs in their opposition involved elders who were inpatients at skilled nursing facilities. *See Covenant Care, Inc. v. Superior Court*, 32 Cal.4th 771, 777 (2004) (elder resided at nursing facility for 8 weeks); *Delaney v. Baker*, 20 Cal.4th 23, 27 (1999) (elder resided at nursing facility for 4 months).[3]

---

[3] Plaintiffs also cite *Husain v. Olympic Airways*, 316 F.3d 829 (9th Cir. 2002). *Husain* did not involve a claim under the Elder Abuse Act, and instead addressed whether a passenger's death

8

The Court is not persuaded by plaintiffs' arguments, and agrees with defendants that the complaint does not allege facts showing that defendants had a caretaking or custodial relationship with Valdez. Under *Winn*, a caretaking or custodial relationship is established "where a person has assumed *significant* responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance," *Winn*, 63 Cal.4th at 155 (emphasis added), and the "distinctive relationship contemplated by the Act entails more than casual or limited interactions." *Id.* at 158. Here, plaintiffs allege a caretaking or custodial relationship based upon the fact Valdez flew on a domestic plane flight operated by defendants, and during that plane flight he was dependent upon the airlines for medical care and care related to his basic needs. Compl. ¶ 47. These allegations fails to establish a "substantial caretaking or custodial role," and instead describe "circumscribed, intermittent, or episodic engagement" that the *Winn* court held to be insufficient. *See Winn*, 63 Cal.4th at 158. Indeed, the relationship between the elder and the medical clinic and physician defendants in *Winn* — which spanned over nine years and involved numerous outpatient appointments for the provision of medical care — was much more lengthy and substantial than the relationship alleged in the complaint. *See Winn*, 63 Cal.4th at 153-54. Because plaintiffs have not identified any basis on which they could amend this claim to allege a caretaking or custodial relationship, the Court GRANTS defendants' motion to dismiss the first cause of action without leave to amend.

## II. Sixth Cause of Action: Unlawful Business Practices

The sixth cause of action alleges a claim for "Unlawful Business Practices Involving a Senior Citizen." The complaint alleges, "By reason of Defendants' failure to comply with state and local law including, but not limited to, Civil Code § 2100, and Welfare and Institutions Code §§ 15600, *et seq.*, Defendants' conduct constituted an unlawful and/or unfair business act under California Bus. & Prof. Code § 17200 *et seq.* and Cal. Bus. & Prof. Code § 17500 *et seq.*" Compl.

---

on an international airplane flight was an "accident" under the Warsaw Convention.

¶ 70.[4]

Under Section 17200, unfair competition is defined as "any unlawful, unfair, or fraudulent business act or practice . . . ." "'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.'" *Schvatrz v. Budget Group, Inc*., 81 Cal. App. 4th 1153, 1159 (2000) (quoting *Podolsky v. First Healthcare Corp*., 50 Cal. App. 4th 632, 647 (1996)). Section 17200 "borrows" violations of other laws and treats them as "unlawful" business practices independently actionable under section 17200. *See Farmers Ins. Exch. v. Sup. Ct.*, 2 Cal.4th 377, 383 (1992).

> Pursuant to Bus. & Prof., Code, § 17200, which defines unfair competition, the "unlawful" practices prohibited are any practices forbidden by law be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. It is not necessary that the predicate law provide for private civil enforcement. Section 17200 borrows violations of other laws and treats them as unlawful practices independently actionable.

*Saunders v Superior Court*, 27 Cal. App. 4th 832 (1994).

Defendants move to dismiss the sixth cause of action on the ground that to the extent this claim relies on a violation of the Elder Abuse Act as a predicate, plaintiffs have failed to state a claim. For the reasons stated above, the Court agrees that plaintiffs cannot state a claim under the Elder Abuse Act, and thus plaintiffs cannot rely on the Elder Abuse Act as a basis for the section 17200 claim. *See Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1057-58 (9th Cir. 2002) (dismissal of predicate claim requires dismissal of section 17200 claim).

Defendants also contend that plaintiffs cannot rely on California Civil Code section 2100 as the predicate for their section 17200 cause of action because Civil Code section 2100 does not proscribe acts or practices that are forbidden by law, but simply codifies a standard of care. California Civil Code section 2100 provides, "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and

---

[4] Plaintiffs' opposition frames the sixth cause of action as alleging "unlawful" business practices (as opposed to "unfair" business practices). Dkt. No. 17 at 8. Further, although the complaint mentions California Business & Professions Code § 17500 (California's False Advertising Law) the parties' briefing does not address this section, and plaintiffs' opposition does not assert that plaintiffs are pursuing a claim under section 17500.

10

must exercise to that end a reasonable degree of skill." Cal. Civ. Code § 2100. Defendants cite a case for the proposition that "negligence claims may not constitute predicate acts for a UCL claim." *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1150 (N.D. Cal. 2010).

Plaintiffs counter that section 17200 broadly prohibits unfair competition, and that an unlawful business practice is defined as "anything that can properly be called a business practice and at the same time is forbidden by law." *Farmers Ins. Exch.*, 2 Cal.4th at 383. Plaintiffs assert that they have alleged a violation of the California common carrier statute, Cal. Civ. Code § 2100, and that defendants have not cited any authority holding that a violation of section 2100 cannot serve as the predicate for a section 17200 claim.

The Court finds that as a pleading matter, plaintiffs' section 17200 claim may proceed to the extent it is based on an alleged violation of California Civil Code section 2100. "Virtually any state, federal or local law can serve as the predicate for an action" under section 17200, *Podolsky*, 50 Cal. App. 4th at 632, including state statutes regulating professional standards, common law, and rules of professional conduct. *See, e.g.*, *Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 517 (2002) (statute regulating practice of law as basis for UCL "unlawful" claim); *CRST Van Expedited, Inc. v. Werner Enterprises, Inc*., 479 F.3d 1099, 1107 (9th Cir. 2007) (intentional interference with contract formed predicate for "unlawful" claim); *People ex rel. Herrera v. Stender*, 212 Cal. App. 4th 614, 632 (2012) (violations of California Rules of Professional Conduct could be used "as a measure of the unlawful practice" for purposes of determining injunctive relief under UCL). In addition, the Court notes that *Stearns* did not address an alleged violation of Civil Code section 2100. In light of the expansive reach of section 17200, as well the absence of any authority barring a section 17200 claim based on a violation of Civil Code section 2100, the Court concludes that plaintiffs may proceed on this portion of their claim, and DENIES this aspect of defendants' motion.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part defendants' motion to dismiss. The first cause of action is DISMISSED without leave to amend.

11

The sixth cause of action is DISMISSED to the extent it is predicated on a violation of the Elder Abuse Act, and plaintiffs may proceed on their sixth cause of action to the extent it is based on a violation of California Civil Code section 2100.

**IT IS SO ORDERED**.

Dated: March 9, 2018

SUSAN ILLSTON
United States District Judge